## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 10-03899-DD |
| Celestine McFadden, | Chapter 7 |
| Debtor. | **ORDER** |

This matter is before the Court on a Motion for Relief from Stay ("Motion") filed by Saxon Mortgage Services, Inc. as servicer for The Bank of New York Mellon as successor indenture Trustee under NovaStar Mortgage Funding Trust, Series 2006-1, its successors and/or assigns ("Saxon") on October 27, 2010 and an Objection to Claim ("Claim Objection") of the Bank of New York Mellon, as successor indenture Trustee under NovaStar Mortgage Funding Trust, Series 2006-1 ("BONYM"), filed by John R. Cantrell, Special Counsel for the chapter 7 trustee, Kevin Campbell ("Trustee"), on March 10, 2011. Trustee also filed a Motion in Limine on December 19, 2011 with regard to certain record custodian affidavits on Saxon's pre-trial exhibit list.[1]  Trustee responded to Saxon's Motion on January 18, 2011.  BONYM responded to Trustee's Claim Objection on May 11, 2011 and replied to Trustee's Objection to Saxon's Motion on the same date.  After a lengthy discovery period, a hearing on all matters was held on December 21, 2011, January 25, 2012, and February 17, 2012.  At the conclusion of the hearings, the Court took several matters under advisement, including the admission of several exhibits offered by Saxon.  The Court now issues this Order.

---

[1] The Motion for Relief from Stay at issue here was filed by Saxon as servicer for BONYM, and the proof of claim was filed by BONYM.  However, throughout the proceedings, counsel for Saxon and BONYM referred to the litigating party only as Saxon, and Saxon was the entity that filed all motions and documents throughout these proceedings.  As a result, while both Saxon and BONYM were involved in this litigation, the Court will refer to the parties collectively throughout this Order as Saxon.

## **FINDINGS OF FACT**

Celestine McFadden ("Debtor") filed a chapter 13 petition on June 1, 2010.  At that time, she was represented by Mr. Cantrell.  A chapter 13 plan was filed on June 15, 2010, which contained statements that the debt to BONYM was listed as disputed in Debtor's schedules and that Debtor reserved the right to dispute the debt "both as to amount and validity if creditor is unable to prove amounts due or legal ownership of this loan."  Debtor also filed an Objection to Claim of BONYM on August 9, 2010.  An objection to confirmation of the chapter 13 plan was filed by BONYM on July 12, 2010, and a joint statement of dispute was filed on August 16, 2010.  A status hearing was held on August 26, 2010, at which Judge Waites ordered Mr. Cantrell to file an adversary proceeding contesting BONYM's interest by September 3, 2010, the end of the following week.  On September 3, Mr. Cantrell filed correspondence with the Court, indicating that while he understood he was supposed to have filed an adversary complaint by that date, Debtor had not yet retained him to do so.  The correspondence also indicated that Debtor had experienced a significant loss in income and that Mr. Cantrell and Debtor were evaluating her options.  On September 14, 2010, Mr. Cantrell filed a Motion to Approve Retainer Agreement and Motion for Expedited Hearing, requesting that the Court approve a retainer agreement for his compensation on an expedited basis.  The Motion to Approve Retainer Agreement was denied by Judge Waites on September 16, 2010.  During the chapter 13 case, Mr. Cantrell, on behalf of Debtor, raised several of the same arguments being presented in the instant proceedings.  After an apparent breakdown in the attorney-client relationship, Mr. Cantrell was relieved as counsel for Debtor on October 5, 2010.  Debtor's case was converted to chapter 7 on October 12, 2010, and Debtor proceeded pro se.

Kevin Campbell, the chapter 7 trustee ("Trustee"), filed an Application to Employ John R. Cantrell as Special Counsel on January 7, 2011, and Mr. Cantrell's employment was authorized on January 26, 2011.  Mr. Cantrell filed the Trustee's Objection to Saxon's Motion eight days prior to the authorization of his employment by the Court and filed the Trustee's Claim Objection over a month after the Trustee's Application to Employ Special Counsel was granted.

In December 2005, Debtor obtained a loan from Loanleaders of America, Inc. ("Loanleaders") in the amount of $189,000 in order to purchase a home in Goose Creek, South Carolina and executed a note and mortgage, granting Loanleaders a security interest in the home.  On December 26, 2005, Loanleaders transferred the note to Novastar Mortgage, Inc. ("Novastar"), as evidenced by an allonge attached to the note and dated December 26, 2005. Pursuant to a Sale and Servicing Agreement dated April 1, 2006, the mortgage was pooled with numerous other mortgages and deposited into a trust ("Trust"), with JPMorgan Chase Bank, NA ("JPMorgan Chase") as indenture trustee and US Bank as custodian.  At that time, Novastar was the servicer of the mortgage.  In October 2006, JPMorgan Chase, pursuant to a Resignation and Assumption Agreement, transferred its trust business to The Bank of New York ("BONY")[2]; thereafter, BONY was the indenture trustee for the Trust.  In October 2007, Novastar sold its servicing rights to Saxon Mortgage Services, Inc. ("Saxon"), and Saxon became the servicer for all mortgages in the Trust.

The pleadings filed by Trustee's counsel are lengthy, but essentially Trustee's counsel argues that for a variety of reasons, BONYM lacked standing to file a proof of claim and Saxon lacked standing to pursue a Motion for Relief from Stay.  At the hearings, Trustee's counsel

---

[2] Effective July 1, 2008, Bank of New York and Mellon Bank merged, and the remaining entity is known as The Bank of New York Mellon ("BONYM").

3

made evidentiary objections to almost every exhibit Saxon attempted to introduce.  The Court's

rulings on Trustee's counsel's evidentiary objections, including those objections set forth in his

Motion in Limine, as well as its findings with respect to Saxon's Motion and Trustee's Claim

Objection, are set forth below.

## CONCLUSIONS OF LAW

### I.  BONYM's Proof of Claim

BONYM filed its first proof of claim on June 17, 2010, and amended the proof of claim

twice, on June 23, 2010 and August 31, 2010. The original proof of claim, filed on June 17,

2010, indicated that the arrearage owed was $46,820.43 and the total amount of the secured

claim was $228,980.77.  Attached to the proof of claim are the initial note and mortgage signed

by Debtor on December 26, 2005 along with an attached prepayment addendum and adjustable

rate and planned unit development riders, a certification of recordation from the Berkeley

County Register of Deeds, and Debtor's chapter 13 plan.  No allonges were attached to the note.

The first amended proof of claim, filed on June 23, 2010, stated the same arrearage and total

secured claim amounts.  Attached to the first amended proof of claim are two invoices from

Saxon's previous counsel relating to the foreclosure of Debtor's residence.  The final proof of

claim, filed on August 31, 2010, provided an arrearage amount of $50,133.28 and a total

secured claim amount of $228,630.62.  Attached to the second amended proof of claim are

Debtor's chapter 13 plan, the note and mortgage Debtor signed on December 26, 2005, along

with a prepayment addendum and adjustable rate and planned unit development riders and an

allonge signed without recourse by Loanleaders and payable to the Order of Novastar Mortgage,

an assignment of mortgage from Mortgage Electronic Registration Systems, Inc. ("MERS") as

nominee for Loanleaders to BONYM dated February 17, 2009, invoices from Saxon's previous counsel, and an escrow analysis spreadsheet.

BONYM's proofs of claim were flawed. BONYM amended its proof of claim three times over a period of almost three months, but not once did it attach documentation sufficient to support its proof of claim. For example, the documentation attached to the proof of claim included copies of the note and mortgage made prior to the indorsements that were established at trial. BONYM's repeated failure to attach sufficient supporting documentation to its proof of claim evidences BONYM's poor document practices. Prior counsel for BONYM merely printed copies of electronic images of the note and mortgage that were maintained in its document retrieval system and not updated as indorsements were added. These practices opened the door for Trustee's objections. While, as discussed at length below, BONYM presented evidence at trial and established its claim, the long delays and squandered time resulting from these practices rest squarely with former counsel for BONYM.

## II.  Trustee's Duties

Trustee and his counsel are complicit in the delay, and their strategy and purpose have been lost on the Court. The Court first reviews a chapter 7 trustee's duties regarding claims and explores Trustee's counsel's compliance with the scheduling orders entered by the Court in this case. 11 U.S.C. § 704(a) sets forth the duties of a trustee in a chapter 7 case and provides, in relevant part, "The trustee shall – (5) *if a purpose would be served*, examine proofs of claims and object to the allowance of any claim that is improper." 11 U.S.C. § 704(a)(5) (emphasis added). "A trustee, while having the right to investigate claims without court authority, must exercise this right judiciously. The trustee cannot engage in fishing expeditions when no purpose would be served." *In re Riverside-Linden Inv. Co.*, 85 B.R. 107, 111 (Bankr. S.D. Cal.

1988) (referring to Fed. R. Bankr. P. 1001, which states, "These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding."), *aff'd*, 99 B.R. 439 (B.A.P. 9th Cir. 1989), *aff'd*, 925 F.2d 320 (9th Cir. 1991).  *See also In re Acadiana Elec. Serv., Inc.*, 66 B.R. 164, 168 (Bankr. W.D. La. 1986) ("The trustee's duty is to recover money to distribute to creditors.  He is not concerned with abstract concepts of justice when there is no possibility of recovery for the estate.").

The procedural history of this litigation is tortured.  The parties were first instructed by the Court to submit an exhibit and witness list and a stipulation of facts not in dispute in the Court's initial Order Setting Discovery Schedule entered January 20, 2011.  A consent order extending the discovery schedule was entered on April 14, 2011, which extended the deadline for filing witness and exhibit lists.  That Order, signed by both parties, states that a joint pretrial brief was due on July 11, 2011 and provides, "The remainder of the Court's Discovery Schedule shall remain in full force and effect."[3]  Another Consent Order Extending Discovery Schedule was entered on June 14, 2011, and provided that the joint pre-trial filing deadline was changed from July 11, 2011 to September 23, 2011.  That Consent Order also provides, "All other provisions in the Court's prior scheduling orders shall remain in full force and effect."  That consent order is signed only by Mr. Cantrell, who certified Saxon's consent.

After Trustee filed a Motion to Compel on September 6, 2011 based on allegedly inadequate discovery responses and Saxon responded on September 20, 2011, the Court held a hearing on the Motion to Compel on October 6, 2011.  At the Motion to Compel hearing, the following occurred:

---

[3] "Discovery Schedule" is the title used throughout the Consent Order to refer to the Court's original Order Setting Discovery Schedule.

Judge Duncan:  When you propound the interrogatory "give me your case," what is it that's appropriate for you to be given?  Clearly you're not suggesting that you get attorney work-product.

Mr. Cantrell:  Of course not, and I'm not looking for his mental impressions, your honor.  I'm smart enough to know how your honor would rule on that one, even though we've never had that issue come up, I've learned.  But what I asked for was documents, statutes, cases. You know, what we're trying to avoid is a repeat of some earlier cases in front of your honor, which were summary proceedings, and where I was – where I had to endure trial by surprise. And didn't do so well.  But your honor published the case anyway.  And, so now I've got to live with that.  But, um, they were summary proceedings, and sometimes that happens in summary proceedings, but we've got a discovery schedule here, we've been allowed to do discovery, and you know, we want to know what case is going to be thrown out against us before we walk in and opposing counsel hands it to us and says, you know (inaudible) we've never heard of that case before.

.  .  .

Judge Duncan:  [So basically what you're asking] --would-- would be for me to say, exchange your pre-trial briefs, so that the Court's educated enough to know what's coming down the pike as well.

Mr. Cantrell: Well, isn't your honor going to do that anyway, I mean, I don't think that's coming as any real surprise.

.  .  .

[To Saxon's counsel] Judge Duncan: I'll let you stand at this point in time on your broad theories, with the understanding that I'm going to require pre-trial briefs in this case, and absent some unfair surprise, I would intend that both parties be bound by that at trial.

An Order on the Motion to Compel was entered on October 25, 2011, and that Order provided, "Since discovery in this case has concluded, the Court finds it necessary to set deadlines for the parties' pre-trial submissions and a trial date in order to facilitate a final disposition of this matter. The parties' pre-trial briefs are due December 7, 2011, and a trial on this matter will be held December 21, 2011 at 9:00 a.m. in Charleston."

Saxon filed a pre-trial brief on December 7, 2011, which contained a list of witnesses and exhibits that Saxon intended to introduce at trial. Trustee did not file anything. Trustee also did not provide Saxon's counsel with copies of any exhibits he intended to introduce. On January 13, 2012, after the first day of trial on the merits, Saxon filed a Motion in Limine to exclude any documents that Trustee's counsel sought to introduce, on the basis that Trustee's counsel had refused to provide them to Saxon in advance. Email correspondence between the parties, attached as an exhibit to Saxon's Motion in Limine, reveals that Saxon's counsel made two requests for copies of Trustee's counsel's exhibits, but Trustee's counsel refused to provide them, stating, "After reviewing your pre-trial brief, it appears that I was correct in remembering that you did not provide me with your exhibit list in that document. It appears that you provided a list of of [sic] 'documents that Claimant may intend to use at trial', not a list of all of the exhibits that you were going to use at trial. In addition, although I haven't yet checked that potential list against your discovery responses, it isn't clear that I even have copies of all of those referenced documents in my possession. Further, your disclosure of those documents was required by my discovery requests, and not required by any court order that I am aware of. . . .

[S]ince you didn't issue any discovery requests, it does not appear that we are required to provide you with advance copies of our exhibits.  Instead, like me, you and Kevin [co-counsel for Saxon and BONYM] will simply have to review them under pressure as they are presented like I did at the last hearing.  At least there will be two of you to do that more quickly than I did, and I don't anticipate at this point having as many exhibits as you did, so your job will be much easier than mine."

A hearing was held on Saxon's Motion in Limine on January 25, 2012.  Trustee's counsel indicated that he would have only three exhibits to introduce: Saxon's amended responses to Trustee's Requests for Admissions, Saxon's answers to Trustee's Interrogatories, and Saxon's pre-trial brief.[4]    At the hearing, the parties settled the Motion by agreeing that Trustee's counsel would provide to Saxon's counsel the paragraph number of each response, answer, or factual statement he would rely on by February 9, 2012 at 5:00 pm.  Trustee's counsel apparently complied with this Order; however, at the hearing he did not actually rely on any of those exhibits.  Instead, his case was unveiled in his closing argument, relying on various articles he handed up to the Court and numerous cases from a five page "table of authorities" he provided to the Court and to Saxon's counsel at the hearing on January 25.[5]    He also relied on Saxon's filings on the Securities and Exchange Commission ("SEC") website and requested that the Court take judicial notice of them for the limited purpose of showing that the filings contained private loan information.  Thus, Saxon and the Court became aware of Trustee's

---

[4] Trustee's counsel also sought to introduce a fourth exhibit, but subsequently withdrew it at the hearing.
[5] Trustee's counsel did not rely on or cite to many of the cases listed in the "table of authorities" in his closing argument.

counsel's arguments for the first time upon hearing Trustee's counsel's closing argument at trial.[6]

Trustee's counsel argued that he did not know that the requirements to file a pre-trial brief and produce witness and exhibit lists were mandatory. He first claimed that he was not aware of the original May 18, 2011 deadline for filing a pre-trial brief containing exhibit and witness lists and that he did not remember there being a scheduling order in the case. Trustee's counsel informed the Court that its requirements were not clear because the original scheduling order contained language requiring the parties to file exhibit and witness lists, but the orders extending the deadlines in the original discovery schedule order did not refer to exhibit and witness lists.[7] The original Order Setting Discovery Schedule provides, "The parties are directed to jointly file one document containing a list of exhibits to be offered at trial, a list of witnesses to be called, and a stipulation of facts not in dispute. This filing shall be made on or before May 18, 2011." The Orders extending the deadlines, both signed by Mr. Cantrell, both specifically extend the deadline for filing a pre-trial brief. Clearly, the original order provided that a joint pre-trial brief containing exhibit and witness lists must be filed. Thus, the provisions in the subsequent orders extending the deadlines to file pre-trial briefs also extended the deadlines for the exhibit and witness lists contained in those briefs as well. The orders were

---

[6] The hearing held on January 25, 2012 was originally intended to be a continuation of the trial on the merits; however, at the last minute, a representative from Saxon, became ill and was unable to travel for the hearing. Because the Court did not receive notice of the illness in time to continue the hearing, the parties traveled to Columbia and in order to keep such travel from being a waste of time, the Court conducted a hearing on the Motion in Limine, and Trustee's counsel presented his case in chief. Despite the fact that no one was aware a trial on the merits would not take place until a mere few hours before the trial was set to begin, Mr. Cantrell told the Court at the January 25 hearing that he was not certain what arguments he would be making in his closing argument and could not explain to the Court how the exhibits he introduced would be used in support of his arguments, except to say that they are being offered only as admissions of a party opponent and not for any other purpose. The Court asked Mr. Cantrell which particular items in the discovery responses he would be relying on, and he said, "To tell you exactly what in each document that I'm going to argue in my oral argument, I can't really do that today, but there are numerous matters in there."

[7] Trustee's counsel also claimed that he did not believe that he was permitted to file a pre-trial brief after the December 7 deadline and that is why he still had not filed one as of the January 25 hearing.

not ambiguous, and if Mr. Cantrell was unclear on the effect of the orders extending the discovery schedule, he should not have signed them.  Even if Mr. Cantrell could reasonably claim confusion with respect to the Court's scheduling orders, the Court clearly ordered Trustee's counsel to produce those lists on the record at the October 6 hearing on the Motion to Compel.  At that hearing, Trustee's counsel complained and argued that Saxon had not produced specific cases, authorities, and arguments that it intended to rely on and stated that he was trying to avoid "trial by surprise", yet he failed to provide the exact same information to Saxon.  At the same hearing, Trustee's counsel stated that he assumed the Court would require him to file a pre-trial brief, and that such requirement didn't come as "any real surprise."  Trustee's counsel did not comply with the Court's repeated orders to file a pre-trial brief and provide information regarding his case to the Court and opposing counsel and has no reasonable excuse for his failure to comply.   He should not now be entitled to benefit from his noncompliance, when opposing counsel had no difficulty understanding or complying with the Court's orders.

Trustee employed Mr. Cantrell to pursue these matters against Saxon and BONYM based on his apparent belief that these creditors have no standing to file claims or pursue relief from stay.  When asked what the purpose of this litigation was, Trustee's counsel referred to 11 U.S.C. § 506(d), which states, "To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless – (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title."  Trustee's Objection to Claim and Objection to Saxon's Motion both only address the standing of Saxon and BONYM and do not address the validity of the underlying debt.  The validity of

the lien on the property was not attacked in the instant matters, and in fact could not be attacked

absent an adversary proceeding.  As a result, if Trustee is successful here, he still will not be

able to sell the property, but will have to commence an adversary proceeding to attempt to

extinguish the lien on the property.  Trustee is attacking the standing of Saxon and BONYM to

file a claim and seek relief from stay but has not advanced any basis for disallowance of the

claim itself.

The value of the property at issue is listed on Debtor's Schedule A as $145,000, and

Schedule A states that the property needs about $10,000 in repairs.  A Broker's Price Opinion,

admitted at trial without objection, values the property between $115,000 and $135,000,

depending on the marketing time for the property.  Debtor took an exemption of $51,450 in the

property, and her Schedule C states, "Debtor intends to exempt any equity up to exemption limit

that may be created from action against Bank of New York Mellon to declare their [sic]

mortgage unsecured."  Mr. Cantrell was employed by Trustee on a contingency basis; the

Amended Order Authorizing Trustee to Employ Special Counsel entered on March 10, 2011

provides that after all reasonable costs of sale and payment of homestead exemptions, Mr.

Cantrell is entitled to recover actual costs and expenses, plus 40 percent of the remaining

proceeds.[8]   Based on all this, it appears, even if Trustee was able to sell the property for

$145,000, which is unlikely given the repairs Debtor indicates are needed, the Broker's Price

---

[8] The Order provides, "To the extent Special Counsel obtains a successful outcome of this litigation, defined as
providing a direct monetary benefit to the estate, either through settlement or successful litigation and liquidation of
the underlying asset for the benefit of the estate (the "Recovery"), the parties agree that, after all reasonable costs of
sale, including normal closing costs, real estate commissions, etc., and after payment of any allowed homestead or
other exemptions, Special Counsel will be able to recover actual costs and expenses incurred under this
employment agreement.  Thereafter, from the remaining balance of the Recovery the fees and costs of such
litigation shall be split as follows: One-Third contingency fee, plus costs if the Recovery is received before
discovery is concluded under the later of any scheduling order, or amended scheduling order in either the
proceeding on the Motion to Modify the automatic stay or Objection to Claim matters; a Forty (40%) percent
contingency fee if the matter settles before the filing of an adversary proceeding; a Fifty (50%) percent contingency
fee once an adversary proceeding is filed."

Opinion submitted at trial, and the current state of the housing market, that there would be little recovery for creditors.  In spite of this, Trustee has pursued this litigation based on theories that were neither disclosed prior to trial nor developed at trial.  There is no indication that Trustee has any evidence that the debt secured by the lien against Debtor's property is anything other than an allowable claim against the estate owed to BONYM, or, if some defect in assignment exists, to some predecessor in title.  Apparently, Trustee's counsel hopes the Court will be careless in its ruling and will "disallow" the claim rather than strike the proof of claim for a lack of standing, thus opening the door to a technical section 506(d) attack, despite the fact that there is no question that the debt is due to someone and that a lien encumbers the real estate.

### III. Trustee's Motion in Limine

Trustee's counsel argues in his Motion in Limine that two affidavits which Saxon planned to offer for the purpose of authenticating certain business records[9] are defective because they do not comply with Federal Rules of Evidence 902(11) and 803(6).  Trustee's counsel relies entirely on *Rambus, Inc. v. Infineon Techs. AG*, 348 F. Supp.2d 698 (E.D. Va. 2004) in arguing that the affidavits are not sufficient to satisfy the authentication requirements of the Federal Rules of Evidence.  Trustee's counsel argues that *Rambus* requires that a person, regardless of whether they are a records custodian, must also meet the requirements for a qualified witness in order to authenticate documents.  That is not the case.

Federal Rule of Evidence 803(6) governs the admissibility of business records and provides that such a record is admissible if:

> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

---

[9] Exhibits 28 and 29 in Saxon's Pre-Trial Brief, docket #179, at pg 9-11.

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Federal Rule of Evidence 902 sets forth certain documents which are self-authenticating, and lists certain records of regular conducted activity as such items, stating that the following is required:

> The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court.  Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.

In *Rambus*, the defendant filed a motion in limine, arguing that several third-party declarations the plaintiff attempted to offer into evidence under Rule 902(11) were not admissible, in part because they failed to meet the requirements of Rule 803(6) and Rule 902(11).  The court first noted that Rule 902(11) requires that a declaration be made by either a records custodian or some other qualified witness.  *Rambus*, 348 F. Supp.2d at 702.  The court then explained the standard for determining whether a declarant is a qualified witness, stating that the declarant must be a person familiar with the creation and maintenance of the business records.  *Id.*  The court stated, "The Fourth Circuit has also held that the term 'qualified witness' is to be interpreted broadly, and requires 'only someone who understands the system used to record and maintain the information . . . someone with knowledge of the procedure governing the creation and maintenance of the type of record to be admitted.'"  *Id.* at 702–03 (quoting *United States v. Sofidiya*, 1998 WL 743597, at *3 (4th Cir. 1998)).  The court found that the declarations the

plaintiff attempted to offer were not admissible because many of them did not address the extent

of the declarant's knowledge of the company's record keeping practices; as a result, there was

no way to determine the declarant's familiarity with the creation and maintenance of the

business records.  *Id.* at 703.

Two affidavits are at issue here. Both are titled "Records Custodian Affidavit."  The first is

signed by John Holtmann, the Associate General Counsel and Vice President of Novastar

Mortgage, Inc. ("Novastar affidavit").  Mr. Holtmann states that he has reviewed certain

documents, that they were made at or near the time of the occurrence of the matters set forth in

them and were made by a person with knowledge of the matters set forth in them, and that they

are true and accurate copies of the business records kept in the regular course of business of

Novastar.  The affidavit does not include any statement regarding Mr. Holtmann's knowledge

or familiarity with Novastar's practices relating to creation and maintenance of business

records.  The second affidavit is signed by Maureen Bodine, the Vice President of U.S. Bank

National Association ("U.S. Bank affidavit").  Ms. Bodine states in her affidavit that she is a

record custodian for U.S. Bank.   The other statements in the U.S. Bank affidavit are

substantially similar to those in the Novastar affidavit.

Trustee's counsel first argued that he did not have "reasonable written notice" of Saxon's

intent to offer the affidavits into evidence because the exhibit list on which the affidavits were

listed was included in Saxon's pre-trial brief and "did not specifically invoke [Rule] 902(11)."

Trustee's counsel maintained this argument throughout the hearings, and at the February 17

hearing cited to several authorities which he contends require a party to specifically state that

their exhibits are being offered under Rule 902(11), including *United States v. Santana*, 352

Fed. Appx. 867 (4th Cir. 2009) and a treatise written by a "bankruptcy judge from Tampa."[10] Trustee's counsel additionally argued that the affidavits did not meet the requirements set forth in *Rambus* because they do not specifically refer to the affiants' knowledge of the creation and maintenance of the records. Saxon first responded that Trustee was provided with notice of the intent to introduce the Novastar affidavit in a letter sent to Trustee on November 14, 2011, to which Trustee's counsel argued that this notice was not sufficient because the letter did not specifically cite Rule 902(11). Saxon further responded that with respect to the Novastar affidavit, even though Mr. Holtmann does not specifically state that he is a records custodian, the title of the affidavit, "Records Custodian Affidavit," is sufficient to meet the standards set forth in Rules 803(6) and 902(11). With respect to the U.S. Bank affidavit, Trustee's counsel argues that Ms. Bodine, who works for U.S. Bank, attempts to verify records that are records of JPMorgan Chase and therefore her "affidavit is without merit".

First, the Court finds that reasonable written notice of Saxon's intent to use the affidavits at trial was provided. Saxon provided a number of exhibits to Trustee well in advance of the hearing on November 14, 2011 and also filed a pre-trial brief with a list of exhibits which included the two affidavits. A specific citation to the Federal Rules of Evidence is not necessary to give effect to the notice of intent to use the affidavit at trial. Trustee's counsel's Motion in Limine and his lengthy and detailed objections at the hearing clearly show that he had ample notice of Saxon's intent to use the affidavits. Providing affidavits that contain a notation which indicates that the source is a record custodian and including the affidavits in a list of exhibits which may be used at trial is sufficient notice under the Federal Rules of Evidence.

---

[10] Counsel for Trustee could not remember the name of the judge or the treatise, and did not produce a copy of the treatise for the Court.

The fact that the exhibit list contained exhibits that "might", as opposed to "would be", used at trial is not the sort of equivocation that deprives a party of notice.

Turning to the substance of the objection, Rule 902(11) requires that a declaration which seeks to certify the authenticity of a business record either be made by a record custodian or by a qualified witness.  To be a qualified witness, the declarant must have knowledge of the company's policies with respect to creation and maintenance of the records.  Here, Ms. Bodine specifically states in the US Bank affidavit that she is a record custodian for US Bank.  Additionally, US Bank is the custodian for the Trust and therefore its regular course of business is to hold and be familiar with the content, creation, and maintenance of Trust records.  As a result, the US Bank affidavit meets the requirements of Rule 902(11).   However, in the Novastar affidavit, Mr. Holtmann does not claim to be a record custodian, nor does he make any representations with respect to his knowledge of the company's policies on record creation and maintenance.   The US Bank affidavit is proper and authenticates those documents accompanying it, while the Novastar affidavit is defective and does not authenticate those documents accompanying it.  The fact that the Novastar affidavit is captioned with a reference to "record custodian" is not sufficient, as the caption is not a matter to which the affiant subscribed.

### IV. Trustee's Other Evidentiary Objections

Trustee's counsel did not object to the admission of Saxon's Exhibit A, Exhibit I, Exhibit O, Exhibit R, Exhibit W, Exhibit X, Exhibit Y, and Exhibit Z, and therefore those exhibits were admitted without objection.[11] Trustee's counsel objected to the admission of the remainder of

---

[11] Saxon did not attempt to introduce Exhibit AA from its pre-trial exhibit list; therefore, that exhibit is not addressed in this Order.  The exhibits admitted without objection are as follows:
Exhibit A-Broker's Price Opinion of Debtor's property

Saxon's exhibits.  Saxon's witness was Mr. David Goss, the Assistant Vice President of Saxon's Bankruptcy Department.  Mr. Goss testified that he is a record custodian for Saxon. Based on Mr. Goss's testimony regarding the exhibits, the Court admitted several of Saxon's exhibits at the hearing over Trustee's counsel's objection and reserved ruling on the admissibility of others.  A discussion of the parties' objections and arguments, followed by the Court's rulings on all contested exhibits, follow.

1.  Objections Based on Lack of Foundation, Lack of Personal Knowledge, and Hearsary

Saxon's Exhibit B is the Sale and Servicing Agreement between Novastar and JPMorgan Chase.  Trustee's counsel objected to the admission of this Agreement based on lack of foundation and hearsay.  Trustee's counsel argued that Mr. Goss testified that he began working for Saxon in September 2008 and therefore the Sale and Servicing Agreement, dated April 1, 2006, predated his employment.  As a result, Trustee's counsel argued, Mr. Goss could not have any personal knowledge with respect to the document and therefore could not lay a foundation for the Agreement.  Trustee's counsel also objected to the admission of the Agreement because Saxon was not a party to the Agreement.  In response to Trustee's counsel's foundation objection, Mr. Goss testified that his knowledge was based on his review of Saxon's records. The Court overruled Trustee's counsel's objection and admitted the Sale and Servicing Agreement as a business record of Saxon.

---

Exhibit I-Delaware Certificate of Trust for NovaStar Mortgage Funding Trust, Series 2006-1
Exhibit O-Certificate of Custodian Pursuant to the Sale and Servicing Agreement dated April 28, 2006
Exhibit R-Assignment of Mortgage dated February 17, 2009 and receipt for recordation from the Berkeley County Register of Deeds dated March 30, 2009
Exhibit W-Note of Referral from LPS to Brice, VanderLinden & Wernick, P.C. dated June 10, 2010
Exhibit X-BONYM's Original Proof of Claim, filed June 17, 2010
Exhibit Y-BONYM's First Amended Proof of Claim, filed June 23, 2010
Exhibit Z-BONYM's Second Amended Proof of Claim, filed August 31, 2010

On cross-examination, Trustee's counsel again renewed his objection, this time arguing that the Sale and Servicing Agreement was an electronic business record which requires additional authentication and therefore a proper foundation had not been laid for its admission. Trustee's counsel based this argument on the fact that the document was stored electronically on Saxon's computer system and the fact that Mr. Goss reviewed the document electronically, while Saxon's legal department provided a paper version of the document to Saxon's attorneys. There is no contention that the duplicates (paper or electronic) deviate from the original.

With the exception of his argument relating to the electronic nature of Exhibit B, Trustee's counsel voiced substantially similar objections to Exhibits C, D, E, F, H, J, M, and V.[12] The Court overruled Trustee's counsel's objection to each exhibit, and Exhibits B,C,D,E,F,H,J,M, and V were admitted at the hearing.

When Exhibit H and Exhibit J were initially introduced by Saxon, Trustee's counsel made standard objections based on lack of foundation, lack of personal knowledge, and hearsay and did not object on the basis that the copies of the documents produced in court were unsigned. As a result, the exhibits were admitted over Trustee's counsel's objection. However, during Trustee's counsel's cross-examination of Mr. Goss, Trustee's counsel noticed that Exhibit H and Exhibit J were unsigned copies and that no signed copies had been submitted to the Court as evidence. After this testimony and after further reviewing Exhibit H and Exhibit J, the Court finds that since they are unsigned, they should not have been admitted into evidence. The Court did not consider those documents in connection with its ruling, although consideration of them

---

[12] Exhibit C-Resignation and Assumption Agreement between JPMorgan Chase and The Bank of New York
Exhibit D-A letter from The Bank of New York notifying Saxon of its merger with Mellon Bank
Exhibit E-Servicing Rights Transfer Agreement, transferring servicing rights from Novastar to Saxon
Exhibit F-Trustee Acknowledgement Agreement between Novastar, The Bank of New York, and Saxon
Exhibit H- Amended and Restated Trust Agreement between Novastar and Wilmington Trust Company
Exhibit J- Indenture Trust Agreement between Novastar and JPMorgan Chase
Exhibit M- Notice of Assignment, Sale or Transfer of Servicing Rights signed by Debtor
Exhibit V- The payoff statement for Debtor's loan as of December 21, 2011, the date of the hearing

would not have had any effect on the Court's findings in this matter.  Exhibit I, admitted

without objection, establishes the existence of the trust, and the terms of the trust are not

otherwise relevant to the disputes before the Court.

   2.  Exhibit G

   Saxon's Exhibit G is a redacted version of a mortgage loan schedule containing information

about Debtor's loan.   The mortgage loan schedule was an attachment to several of the

documents introduced into evidence by Saxon, and was attached to those documents in the

securitization process.[13]  Testimony shows that the exhibit was redacted to remove information

relating to the approximately 8,000 other mortgages in the Trust, but contained Debtor's

account number, address, and other information relating to Debtor's loan. Mr. Goss testified

that the redacted version of the document containing only Debtor's information accurately

reflected the information contained in the full document. Saxon brought to the hearing a

complete copy, containing information relating to all mortgages in the Trust, but asserted that

the information had been redacted based on privacy concerns and that it would be improper for

Saxon to introduce the document in its entirety.   Saxon further argued that the information

contained in the document which related to other borrowers was completely irrelevant to this

proceeding and therefore no purpose would be served by its introduction.   Trustee's counsel

objected.  The grounds for his objection were that the document was incorporated by reference

into the Sale and Servicing Agreement and that the document had been edited in anticipation of

litigation and therefore was not an original business record or duplicate of an original business

record.  The Court, in response to the objection, offered to inspect the entirety of the document

if Trustee's counsel desired that the Court do so.  Trustee's counsel declined, but maintained his

---

[13] References to the mortgage loan schedule are present in Exhibit B, the Sale and Servicing Agreement; Exhibit E, the Servicing Rights Transfer Agreement; Exhibit H, the Amended and Restated Trust Agreement; and Exhibit J, the Indenture Trust Agreement.

objection and stated that Saxon's privacy concerns were not valid. The privacy interests of other non-bankruptcy borrowers are legitimate reasons not to have the entire document in evidence. In addition, the document is voluminous and it is proper to introduce a summary as long as the entire document was available at the hearing. The objection of Trustee's counsel is overruled.

   3. <u>Exhibit K and L</u>

Saxon's Exhibit K and Exhibit L are, respectively, the note and mortgage at issue in this case. Saxon brought the original note and mortgage to the hearing, but requested at the hearing that copies of the documents be admitted into evidence in lieu of the original note and mortgage. Trustee's counsel objected to this request, stating that a portion of his argument related to the number of staple holes in the original documents. The Court offered to examine the originals at the hearing; however, Trustee's counsel stated this was not sufficient because the Court might need to refer to the staple holes in the original documents at a later date when the Court was writing its opinion. As a result, Trustee's counsel insisted that the original documents be submitted into evidence, and at Trustee's counsel's insistence, the original documents were admitted. Trustee's counsel also objected to the admission of the note and mortgage based on lack of authentication because Trustee's counsel argued that Mr. Goss had no way of knowing what the documents actually were. Trustee's counsel argued that the fact Mr. Goss was a records custodian did not provide him with sufficient knowledge to authenticate the documents. The Court overruled Trustee's counsel's objection and admitted Exhibits K and L.

4.  Exhibit N

Exhibit N is a letter which was sent by Saxon to Debtor after the servicing rights to the loan

had been transferred.   Trustee's counsel objected, arguing that Mr. Goss had no knowledge

regarding whether the letter was actually sent to Debtor.  The Court admitted the document over

Trustee's counsel's objection.

5.  Exhibit P

Saxon's Exhibit P is a power of attorney executed by BONYM, giving Saxon the right to

engage in certain actions as servicer, including instituting foreclosure actions.  Trustee's counsel

objected on the grounds of relevance, as he argued that the power of attorney did not contain

any language giving Saxon authority to take any action in a bankruptcy case.  The Court found

the power of attorney was relevant because its admission coincided with Mr. Goss's testimony

that Debtor's loan was in default and that a foreclosure action had been instituted.  As a result,

the Court admitted it into evidence over Trustee's counsel's objection.

6.  Exhibit Q

Exhibit Q is a second power of attorney from BONYM to Saxon, dated January 4, 2011.

Mr. Goss testified that this power of attorney had to be executed because the previous power of

attorney, Exhibit P, had a limited life and had expired.  Trustee's counsel once again objected

on the grounds of relevance because he did not believe the power of attorney gave Saxon power

to take any actions with respect to a bankruptcy case and because no actions other than those

taken in Debtor's bankruptcy case had been taken with respect to the loan since January 4,

2011.  In response, Saxon argued that the language in this power of attorney was identical to

that in Exhibit P and that the purpose of the exhibit was to show that although the previous

power of attorney had a limited life, the power of attorney was renewed and Saxon continues to

have the same powers as it did under the previous document.  The Court admitted Exhibit Q over objection, stating that it deals with Saxon's ability to take action with respect to the mortgage loan at issue and therefore is relevant to the present dispute.

7. <u>Exhibit S</u>

Mr. Goss identified Exhibit S as an Agreement for Signing Authority between Saxon and Mortgage Electronic Registration Systems, Inc. ("MERS").  Trustee's counsel objected based on lack of foundation and hearsay.  In response to Trustee's counsel's objection, Mr. Goss testified that the document was part of Saxon's records and was a normal part of the mortgage securitization process. Trustee's counsel also argued that the document did not have a corporate seal and did not refer to the Board of Directors approving the resolution and was therefore not admissible. The Court admitted Exhibit S over Trustee's counsel's objection, finding that there was a sufficient foundation laid for the document.  After the Court's ruling, Trustee's counsel further argued that the document did not give authority relating to an assignment of mortgage and therefore was not relevant.  Saxon responded and pointed out that the language in the document provides that the persons whose signatures appeared on the attached list are authorized to "execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System."  Based on the language in the document, the Court maintained its original ruling and admitted the document into evidence.

8. <u>Exhibit T</u>

Saxon's Exhibit T is a payment history on the loan which was created by Novastar.  Saxon maintained the document was admissible because the document was authenticated by the Novastar affidavit, discussed previously.  Saxon stated that the document was admissible for an additional reason, in that the document became a record of Saxon when it began servicing the

23

loan and therefore can be authenticated by Mr. Goss, a record custodian for Saxon.  Trustee's counsel argued that the document could not be authenticated by Mr. Goss because he did not have personal knowledge with respect to it.

As the Court stated above in its discussion of Trustee's Motion in Limine, the Novastar affidavit is defective and therefore cannot serve to authenticate the Novastar payment history. However, Mr. Goss testified that Saxon maintains in its records a full and complete payment history for the loan, and that payment history includes the payment history when the loan was serviced by Novastar.  Mr. Goss testified that the payment history of Novastar was received in an electronic data transfer and that he believed all data was received and that no data was lost in the transfer.  At the hearing, the Court took under advisement whether the Novastar affidavit was proper and whether Exhibit T was admissible.  Exhibit T is not admissible based on the Novastar affidavit, but, based on Mr. Goss's testimony, is admissible as a business record of Saxon.

9.  Exhibit U

Mr. Goss identified Exhibit U as a payment history from the time Saxon became servicer. Trustee's counsel objected on the grounds of it being an electronic business record and there being no foundation laid for how it was produced and the processes for how Saxon's computer system works.  Trustee's counsel questioned whether the witness was competent to authenticate the document.  In response to Trustee's counsel's  objection, Mr. Goss gave detailed testimony regarding the computer system used by Saxon to record payment histories and identified Exhibit U as being an accurate report of the electronic data in the computer system and reflecting all payments made by Debtor.  The Court admitted Exhibit U over Trustee's counsel's objection, after which  Trustee's  counsel  cited  Professor  Imwinkelreid's  twelve  factor  test  for

authenticating electronic business records and argued that the testimony of Mr. Goss had not satisfied the twelve factors.

Professor Imwinkelried, one of the foremost experts on evidentiary foundations, endorses the use of the following eleven-part test to authenticate electronic business records:

1.  The business uses a computer.
2.  The computer is reliable.
3.  The business has developed a procedure for inserting data into the computer.
4.  The procedure has built-in safeguards to ensure accuracy and identify errors.
5.  The business keeps the computer in a good state of repair.
6.  The witness had the computer readout certain data.
7.  The witness used the proper procedures to obtain the readout.
8.  The computer was in working order at the time the witness obtained the readout.
9.  The witness recognizes the exhibit as the readout.
10. The witness explains how he or she recognizes the readout.
11. If the readout contains strange symbols or terms, the witness explains the meaning of the symbols or terms for the trier of fact.

*Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534 (D. Md. 2007) (quoting *In re Vee Vinhnee*, 336 B.R. 437, 446–47 (B.A.P. 9th Cir. 2005)).  In response to Trustee's counsel's objection, Saxon engaged in a line of questioning, set forth below, which satisfied all of the Imwinkelried factors.

1.  *The business uses a computer.*

Mr. Goss testified that in maintaining payment histories on the loans which it services, Saxon utilizes a computer system.

2.  *The computer is reliable.*

Mr. Goss testified that the computer system which Saxon uses to track payment histories is reliable, that he had not experienced problems with it, and that he did not believe that others had experienced problems.

3.   *The business has developed a procedure for inserting data into the computer.*

Mr. Goss testified that Saxon had a standard procedure for inserting data into its computer system.   Mr. Goss explained that the computer system has different templates for each department to use based on the job functions it performs; for example, the payment department has the capability to enter payments, while other departments only have the capability to review payments.

4.   *The procedure has built-in safeguards to ensure accuracy and identify errors.*

In discussing this requirement, Mr. Goss referred to his previous answer, in which he testified that the computer system has safeguards which allow departments within Saxon to only perform those data input functions within their job duties; as a result, employees of Saxon can only input or edit data in the computer system that is within the scope of their job functions.

5.   *The business keeps the computer in a good state of repair.*

Mr. Goss stated that Saxon had not had any problems with the condition of the computer system and that it was kept in good condition.

6.   *The witness had the computer readout certain data.*

Mr. Goss testified that Exhibit U, Saxon's payment history, was created by making a query to an electronic data warehouse created by Saxon after extensive research and development.  He testified that any employee of Saxon could obtain reports by making queries.  Mr. Goss testified that the tool he used to create Exhibit U creates only standard reports providing information relating to the loans serviced by Saxon.  Standard reports, Mr. Goss testified, include payment histories and payoff summaries.

7.   *The witness used the proper procedures to obtain the readout.*

26

Mr. Goss testified that in obtaining Exhibit U, he used standard procedure and made a query to obtain a standard report, as explained above.

8. *The computer was in working order at the time the witness obtained the readout.*

Mr. Goss stated that he did not have any trouble with Saxon's computer system during the process of obtaining Exhibit U.

9. *The witness recognizes the exhibit as the readout.*

Mr. Goss testified that he recognized Exhibit U as the payment history he obtained by using the standard procedure previously described.

10. *The witness explains how he or she recognizes the readout.*

Mr. Goss testified that he can identify when looking at documents such as Exhibit U whether the document was created by Saxon's computer system, whether it was created by another servicing system, or whether it was not created by a servicing system.

11. *If the readout contains strange symbols or terms, the witness explains the meaning of the symbols or terms for the trier of fact.*

Mr. Goss explained that Exhibit U contains "transaction codes" which provide information regarding what type of transaction the entry relates to.  For example, he testified that an entry with an "E" transaction code would be an escrow transaction.

After this line of questioning, Trustee's counsel maintained his objection.  The Court overruled Trustee's counsel's objection, stating that a sufficient foundation had been laid, and admitted Exhibit U.

10. Exhibit BB

Exhibit BB is an affidavit from US Bank.  As discussed above, the Court admitted this affidavit over Trustee's counsel's objection based on the fact that Ms. Bodine identified herself as a record custodian for US Bank.


**V.  Admission of Evidence**

Trustee's counsel objected to Exhibits B, C, D, E, F, H, J, K, L, M, N, S, T, U and V on the basis of lack of foundation and hearsay.  Trustee's counsel argued that all of these exhibits were not admissible because Mr. Goss did not have personal knowledge with respect to them and could therefore not authenticate them.   Trustee's counsel maintained these objections throughout trial, despite substantial additional testimony from the witness establishing that he was familiar with Saxon's records and their creation and maintenance.  At the February 17 hearing, Trustee's counsel repeated these objections and pointed to Mr. Goss's response when questioned about the definition of the term records custodian.  Trustee's counsel asked Mr. Goss what he believed the definition of a records custodian is, and Mr. Goss responded that it is someone who has access to Saxon's records.   Trustee's counsel argued that under this definition, all Saxon employees, as well as Saxon's counsel, are record custodians.  Trustee's counsel argued that a statement that a person is a records custodian is not sufficient for a person to be a records custodian and cited to a bankruptcy evidence manual written by bankruptcy judge Barry Russell.  Trustee's counsel stated that in order to authenticate documents of a prior servicer, a record custodian from the prior servicer is required, even if the records have since become business records of the current servicer, in this case, Saxon, unless the witness from the current servicer has personal knowledge regarding the creation and maintenance of the prior

servicer's records.   Trustee's counsel noted a number of alleged deficiencies in Mr. Goss's knowledge of the records Saxon sought to introduce, including that he did not personally print out the exhibits from Saxon's computer and that he was not able to articulate the make and model of Saxon's mainframe computer and his personal computer.

In *Midfirst Bank, SSB v. C.W. Haynes & Co., Inc.*, 893 F. Supp. 1304 (D.S.C. 1994), the United States District Court for District of South Carolina discussed the business records exception under Fed. R. Evid. 803(6).   In *Midfirst Bank*, two entities, Chemical Bank and Participants Trust Company ("PTC"), had an arrangement in which Chemical Bank provided PTC with data through input by Chemical Bank's employees into a transaction journal.   *Id.* at 1310.   As a result, PTC's computer records were entirely based on Chemical Bank's records. *Id.*   A witness for PTC testified that he did not have any knowledge regarding how Chemical Bank's records were produced.   *Id.*   The defendants in the case argued that PTC's records were inadmissible hearsay because they were actually just replications of information from Chemical Bank.   *Id.*

The District Court first stated, citing numerous authorities, that it was immaterial that the records were not actually produced by PTC, as Rule 803(6) allows the admission of business records prepared by another entity.   *Id.*   The court also noted that an employee of the entity preparing the documents, in this case, Chemical Bank, is not required to lay the foundation for the business records in order for them to be admissible.   *Id.*   The court further stated that Rule 803(6) "does not require the testifying witness to have personally participated in the creation of the document or to know who actually recorded the information."   *Id.* at 1311 (citing *United States v. Keplinger*, 776 F.2d 678, 693 (7th Cir. 1985)).   Instead, the court stated, under the

business records exception, the witness must merely be familiar with the record keeping system.

*Id.* (citing *United States v. Keplinger*, 776 F.2d 678, 694 (7th Cir. 1985)).

In response to the defendant's argument that computer records required additional foundation in order to be admissible, the court stated:

> In [*United States v. Russo*, 480 F.2d 1228 (6th Cir. 1973)] the court recognized that the business records exception should be liberally construed to avoid the former archaic practice of requiring authentication by the preparer of the record. In discussing computer printouts, the court noted that modern businesses rely largely upon computers to store large quantities of information, and such information is admissible so long as it is trustworthy and reliable. The only portion of *Russo* which discusses a need for programming data involves scientific computer evidence on neutron activation analysis used to prosecute the defendant. Clearly, scientific computer evidence used in a criminal case is distinguishable from the transaction journal at issue here. The transaction journal cannot be said to require the degree of scrutiny that scientific evidence requires. . . . The Bankruptcy Court for the Eastern District of Virginia noted that '[d]ecisions are legion admitting computer records as Rule 803(6) business records.' Computer records are admissible so long as the requirements of Rule 803(6) are met, and no more is required.

*Midfirst Bank*, 893 F. Supp. at 1311 (internal citations omitted).

Rule 803(6) first requires that the documents in question were kept in the ordinary course of the company's business and that they are authenticated by the testimony of a record custodian or "other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Midfirst Bank*, 893 F. Supp. at 1310 (quoting Fed. R. Evid. 803(6)). Trustee's counsel did not contest that the records were kept in the course of Saxon's regularly conducted business activity, and clearly they were. Mr. Goss testified to lay the foundation for all the exhibits at issue, and as discussed in further detail below, as a record custodian for Saxon, he meets Rule 803(6)'s authentication requirement. As to the source of the information and the method and circumstances of preparation, the Court does not find any indication that the trustworthiness of the documents should be questioned. That information which was not actually created by Saxon was obtained from previous servicers

or mortgagees, and no evidence was presented to indicate that the record keeping practices of those entities were flawed.  Mr. Goss testified that no records were lost in the transfer from previous entities to Saxon, and evidence regarding Saxon's record keeping practices indicated that such practices were well-established and appropriate.

Trustee's counsel's main arguments related to Mr. Goss's qualifications as a record custodian and his ability to authenticate the exhibits.  *Midfirst Bank* makes clear that for documents to be admissible under the business records exception, they do not have to be actually created by the witness testifying to authenticate them, as Trustee's counsel appears to argue, nor do they even have to be created by the entity by which the witness is employed. This is evident from the language of Rule 803(6), as it provides that a document falls within the business records exception if it meets the other two requirements discussed above and is "made at or near the time by, or *from information transmitted by*, a person with knowledge."  Fed. R. Evid. 803(6).  Further, the witness does not have to have met the person who created the records or even know their existence or identity.  Instead, Rule 803(6) merely requires, for records to be admissible as business records, the witness must be familiar with the company's record keeping system.  *Midfirst Bank*, 893 F. Supp. at 1311.  Mr. Goss, as a record custodian for Saxon, clearly meets that test.  His testimony established that he has custody of Saxon's records and is familiar with how they are obtained, modified, and stored.  Trustee's counsel's objections regarding the admissibility of Exhibits B, C, D, E, F, K, L, M, N, S, T, U, and V are overruled. Those exhibits are admitted as business records.

The Court also notes that *Midfirst Bank* addressed electronic business records and thus provided further support for the Court's rulings on the admissibility of Exhibits U and V. Trustee's counsel originally objected to Exhibit U, a payment history for Debtor's loan since the

beginning of Saxon's servicing, on the basis of lack of foundation and insisted that the Imwinkelreid factors be satisfied in order for the exhibit to be admissible. After extensive testimony from Mr. Goss which satisfied all of those factors, discussed above, Trustee's counsel maintained his objection based on lack of foundation. Trustee's counsel also objected based on lack of foundation to Exhibit V, a payoff statement obtained from Saxon's computer system.

Two different standards exist for electronic business records. Records which are not created by a computer but are merely stored on one are not subject to the particular reliability concerns that arise with records generated by a computer. As a result, they are subject to the lesser standard set forth in *Midfirst Bank*, which states that computer records, with limited exceptions not applicable here, must merely meet the requirements of Rule 803(6) and do not require additional authentication. *Midfirst Bank*, 893 F. Supp. at 1311. Records that are generated by a computer using data compiled or created by the computer present questions regarding reliability and accuracy which require a higher standard for authentication. Thus, records created by this method are subject to the standard suggested by Imwinkelreid and must meet each of the factors. Despite the fact that Trustee's counsel maintained his objection to Exhibit U and V after Mr. Goss was questioned based on each of the Imwinkelreid factors, the Court finds that all of the factors were met and Exhibits U and V were properly authenticated. For the reasons discussed above, Exhibits U and V clearly meet the requirements of Rule 803(6). To the extent that Trustee's counsel's objections to any other exhibits are based on the fact that they were produced from Saxon's computer system, those objections are also without merit. The requirements of Rule 803(6) have been met and the exhibits are admissible.

## VI. Trustee Standing

Saxon argues that Trustee does not have standing to attack the propriety of the transfers between servicers and trustees and the documents which enforce those transfers, because Trustee is not a party or third party beneficiary to those agreements.  Mr. Cantrell argues that there is substantial case law supporting his position that a debtor, and derivatively a bankruptcy trustee, does have standing to say "a creditor is not a creditor" and cites *In re Kemp*, 440 B.R. 624 (Bankr. D.N.J. 2010) for this proposition.

Courts addressing the standing of a borrower to object to the validity of assignments of his loan have found that a borrower lacks standing to attack assignments due to his status as a third party.  *See Oum v. Wells Fargo, N.A.*, --- F. Supp.2d ---, 2012 WL 390271, at *4 (D. Mass. Feb. 8, 2012) (citing numerous recent cases finding that debtors have no standing to challenge assignments of their mortgage and holding that the plaintiffs lacked standing to challenge the validity of the assignments); *Martin v. GMAC Mortgage Corp.*, No. 11-00118 LEK-BMK, 2011 WL 6002617, at *12 (D. Haw. Nov. 30, 2011) ("Plaintiffs were not parties to the Assignment and they have not presented any evidence indicating that they were intended beneficiaries of the Assignment.  Plaintiffs therefore do not have standing to object to the Assignment."); *Livonia Prop. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC*, 717 F. Supp.2d 724, 735–36 (E.D. Mich. 2010) ("Borrower disputes the validity of the assignment documents on several grounds outlined above.  But, as a non-party to those documents, it lacks standing to attack them. . . . Borrower certainly has an interest in avoiding foreclosure.  But the validity of the assignments does not effect [sic] *whether* Borrower owes its obligations, but only to *whom* Borrower is obligated.").  *See also Kain v. Bank of New York Mellon et al. (In re Kain)*, No. 08-08404-hb, Adv. No. 10-80047-hb, 2012 WL 1098465, at *8 (Bankr. D.S.C. Mar. 30, 2012)

33

("[T]his Court is swayed by recent authority finding that debtors, who are not parties to or third party beneficiaries of a [Pooling and Servicing Agreement], lack standing to challenge the validity of or noncompliance with terms of a [Pooling and Servicing Agreement]. . . . Further, the Court is not persuaded by Plaintiffs' argument that they must be allowed to challenge the [Pooling and Servicing Agreement] and violations thereof in order to ensure that they pay the proper entity entitled to enforce the Note.") (internal citations omitted).  While these cases address the standing of a borrower or debtor to challenge the validity of an assignment, a chapter 7 trustee steps into the shoes of a debtor during a chapter 7 case; therefore, the same logic is applicable to the standing of the chapter 7 trustee as well. *See In re Franklin Equip. Co.*, 418 B.R. 176, 210 (Bankr. E.D. Va. 2009) (quoting *Stratton v. Sacks*, 99 B.R. 686, 692 (D. Md. 1989)); *Vieira v. AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.)*, 392 B.R. 197, 203, n.5 (Bankr. D.S.C. 2008).   Although the trustee has certain special powers with respect to a bankruptcy estate, generally, the trustee has only the rights that the debtor had in the property under state law.  *Franklin Equip.*, 418 B.R. at 210.  *See also In re Reasonover*, 236 B.R. 219, 226 (Bankr. E.D. Va. 1999) ("[A] bankruptcy trustee who is claiming under § 541(a)(1) as successor to the debtor cannot acquire any greater rights in property than the debtor had.").

Trustee's counsel inaccurately cites the reasoning and holdings of *In re Kemp*, 440 B.R. 624 (Bankr. D.N.J. 2010).  *Kemp* involved a chapter 13 debtor who owned several pieces of property subject to multiple mortgages. *Id.* at 626. On his Schedule D, the debtor listed that the first and second mortgages on one of his properties were held by Countrywide Home Loans.  *Id.* Countrywide, as servicer for Bank of New York, filed a secured proof of claim for $211,202.41, and the debtor commenced an adversary proceeding, asserting that Bank of New York could not enforce the underlying obligation because the original note listed the lender as "Countrywide

Home Loans, Inc." *Id.* at 627. The mortgage listed "America's Wholesale Lender" as the lender, and there was an unsigned allonge "accompanying the note" which "direct[ed] that the debtor 'Pay to the Order of Countrywide Home Loans, Inc., d/b/a America's Wholesale Lender.'" *Id.* Subsequent to their execution, the note and mortgage were packaged with other loan documents and sold to Bank of New York as trustee, and a Pooling and Servicing Agreement was executed between the sellers and the Bank of New York. *Id.*

The note executed by the debtor was apparently never indorsed or delivered to the Bank of New York, but the mortgage was assigned to it. *Id.* At the trial, Countrywide introduced an undated allonge to the note, which provided that payment was to be made to Bank of New York as Trustee and was signed by a Vice President of Countrywide Home Loans, Inc. *Id.* at 628. A supervisor from the servicer testified at the hearing that the allonge was prepared in anticipation of litigation and was signed several weeks prior to the commencement of the trial. *Id.* She further testified that the note was always in Countrywide's possession and that the allonge was never attached to the note. *Id.*

The court in *Kemp* found that Countrywide's claim had to be disallowed because it was unenforceable under New Jersey law. *Id.* at 629. The court stated that the facts that the owner of the note, Bank of New York, never had possession of the note and that the note was never indorsed to Bank of New York rendered the note unenforceable and went on to discuss these findings in detail. *Id.* at 629–30. While the court did address this matter in the context of an adversary proceeding filed by the debtor, it does not appear from the court's opinion that there was any dispute regarding the debtor's standing to bring the adversary proceeding, and the court's opinion does not address that issue at all. As a result, the fact that the court in *Kemp* issued an opinion on the ultimate issue raised by the debtor is not authority for the proposition

35

that Trustee has standing to attack transfers between parties pursuant to agreements to which Trustee was not a party.

Nor is *Kemp* useful in determining the ultimate issues in this case, whether BONYM has standing to file a proof of claim and whether Saxon has standing to pursue relief from stay.  In *Kemp* significant issues existed with the note and mortgage from the date of their execution and continued through the date of trial.  The servicer's representative who testified at the hearing conceded that no allonge was prepared until just prior to trial, and then it was prepared in anticipation of litigation.  The original note and mortgage contained conflicting information regarding the initial lender, and even though the note and mortgage were sold, the original note never left the original owner's possession. There was also some question about whether Countrywide was aware of the note's location, as during the litigation it produced a "Lost Note Certification."  *See Kemp,* 440 B.R. at 628, n.7.   *Kemp* presented significant issues throughout the life of the loan that do not exist here.  The reasoning in *Kemp* is not applicable in the present case, and Trustee's counsel's reliance on it is misplaced.

## VII.   Standing of Saxon

Trustee's counsel presented various arguments to the Court in an attempt to attack Saxon's standing.  Most of these arguments were articulated for the first time in Trustee's counsel's closing argument, as Trustee's counsel failed to file a pre-trial brief, despite the Court ordering him to do so, and also failed to provide opposing counsel or the Court with any notice of his contentions in this litigation.  The parties were limited to one hour of closing argument.  In his closing argument, Trustee's counsel presented numerous arguments, many of which consisted simply of a statement regarding an alleged technical deficiency with one of Saxon's exhibits.  Trustee's counsel apparently did not feel he had sufficient time to present all of his arguments,

so he gave the Court numerous law review articles and memorandums, including an untitled and unsigned memorandum from his "colleague in Connecticut," apparently in an attempt to make additional arguments through these authorities. Because many of Trustee's counsel's arguments were made for the first time in his closing argument and were not fully fleshed out or supported by evidence or in some cases, any authority, the Court has only addressed those arguments which were, for the most part, fully presented. The other arguments simply mentioned by Trustee's counsel or made by reference to a secondary source handed up to the Court during Trustee's counsel's closing argument merit no further discussions.

    1. <u>New York Law</u>

Trustee's counsel argues that the Sale and Servicing Agreement, Exhibit B, states that it is governed by New York law and therefore, New York law "governs whether or not [BONYM] is the lawful owner and holder of the mortgage Note." Trustee's Claim Objection, docket # 127. Trustee's counsel argues that to the extent that the Trust was funded with any loans pursuant to the Sale and Servicing Agreement, the Trust is governed by New York law.

Saxon responds that although the Sale and Servicing Agreement states that it is governed by New York law, the Trust Agreement states that it is governed by Delaware law. The Sale and Servicing Agreement is dated April 1, 2006, and the Trust Agreement is dated April 28, 2006; because the Trust Agreement was created subsequent to the Sale and Servicing Agreement and provides that Delaware law applies to the Trust, the Trust is a Delaware trust and Delaware law applies.

 Section 11.15 of the Sale and Servicing Agreement states, "This agreement shall be governed by, and construed in accordance with, the internal laws (as opposed to conflict of laws provisions) of the State of New York." Thus, based on the plain language contained in the Sale

and Servicing Agreement, it is indeed governed by New York law.    However, this determination has no effect on the outcome of this case.  Which state's law governs the Sale and Servicing Agreement is completely irrelevant to the determination of whether Saxon had standing to file a proof of claim or pursue a Motion for Relief from Stay.  The Court finds that New York law governs the Sale and Servicing Agreement but draws no other conclusions as a result of such finding.

    2.  <u>Unsigned Documents</u>

Trustee's counsel argues that the Amended and Restated Trust Agreement, Exhibit H, is unsigned and therefore, under New York law, which, as explained above, he contends is controlling, it is not valid.  He cites several New York cases for this proposition, including *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144 (1979) and *Skanska USA Bldg., Inc. v. Long Island Univ.*, No. 15097/06, 2010 WL 3666991 (N.Y. Sup. Ct. Sept. 21, 2010).  He also argues that two other documents on which Saxon primarily relies, the Sale and Servicing Agreement, Exhibit B, and the Indenture Trust Agreement, Exhibit J, are also unsigned and they are therefore also invalid.

The Sale and Servicing Agreement admitted into evidence over Trustee's counsel's objection contains numerous signatures.  It bears the following signatures: Matt Kaltenrieder, Vice President of Novastar Mortgage, Inc., Sponsor and Servicer; Matt Kaltenrieder, Vice President of Novastar Certificates Financing Corporation, Depositor; Janel R. Havrilla, Senior Financial Services Officer of Wilmington Trust Company, not in its individual capacity, but solely as Owner Trustee under the Trust Agreement; Andrew M. Cooper, Assistant Vice President of JPMorgan Chase Bank, N.A., not in its individual capacity, but solely as Indenture Trustee; Mark W. McDermott, Vice President of J.P. Morgan Trust Company, N.A., as Co-

Trustee; and Maureen Bodine, Authorized Agent of U.S. Bank N.A., as Custodian.   These signatures represent all entities who were parties to the Sale and Servicing Agreement; Trustee's counsel's argument that the Sale and Servicing Agreement is unsigned and invalid is simply wrong.   Some of the exhibits to the Sale and Servicing Agreement are not signed, but the exhibits are forms to be used in connection with the Agreement.   The Agreement itself is signed.

With respect to Exhibit H and Exhibit J, the Court notes that they are indeed unsigned, and for this reason the Court, as previously discussed, determined that Exhibit H and Exhibit J were inadmissible.   If Trustee's counsel had raised an issue regarding whether the Trust actually exists during the pendency of this litigation, these documents would likely be defective in that they do not contain signatures; the Court does not speculate on what the ultimate result or effect of that finding would be, as it is immaterial for purposes of this case, although the Court does note that in this case the existence of the Trust was established by Exhibit F, the Trustee Acknowledgement Agreement, and Exhibit I, the Delaware Certificate of Trust for NovaStar Mortgage Funding Trust, Series 2006-1.[14]   Trustee's counsel failed to raise any issues with respect to the existence of the Trust until his closing argument and even then did not expressly contend that the Trust did not exist but instead appeared to hint at this conclusion by merely pointing out technical deficiencies in Saxon's exhibits.   He did not articulate this argument in his pleadings with the Court, and he did not present any evidence on the argument throughout the trial of these matters.   Despite the Court's orders requiring him to do so, he did not file a pre-trial brief containing his contentions and failed to provide opposing counsel with any notice of his arguments except a list of case citations which he might rely on at trial.   The Court will

---

[14] Trustee's counsel did not object to the admission of Exhibit I.  Trustee's counsel did object to the admission of Exhibit F, but that objection was overruled at the hearing.

not permit Trustee's counsel to suddenly attack the existence of the Trust based on the appearance of two unsigned documents, when he failed to raise this issue at any time during the litigation on this matter.  The Court takes note of the fact that the Amended and Restated Trust Agreement and the Indenture Trust Agreement are unsigned, but because the existence of the Trust has not been and cannot now be questioned, the fact that the copies of the documents produced in court are unsigned has no bearing on the ultimate issues in this case.

3.  <u>Lack of Mortgage Loan Schedule</u>

Trustee's counsel points out that no mortgage loan schedule was attached to the exhibits submitted to the Court.  Trustee's counsel points to Mr. Goss's testimony that he was not sure whether or not the mortgage loan schedule was attached to certain documents in Saxon's records and argues that this is evidence no mortgage loan schedule even existed and that because no mortgage loan schedule was attached to the documents creating and governing the Trust, there is no way to tell what loans, if any, were transferred to the Trust.

On December 21, Saxon introduced a redacted version of the mortgage loan schedule containing only that information relating to Debtor's loan.  However, Saxon had in its possession at trial the entire mortgage loan schedule which contained information for over 8,000 loans, and when Trustee's counsel objected to the introduction of the redacted version, Saxon offered to provide the Court with the full version.  Saxon stated to the Court that they did not want to introduce the entire document into evidence because it was voluminous and because it contained private information about borrowers.  The Court offered to take the entire mortgage loan schedule to review in camera, but Trustee's counsel told the Court it was not necessary to do so, and the redacted version was admitted as Exhibit G.

While it is true that the versions of the documents introduced as evidence by Saxon purport to contain an attached mortgage loan schedule but do not in fact have one attached, the Court finds it is reasonable for Saxon to refrain from attaching a loan schedule containing detailed loan information for over 8,000 borrowers to exhibits introduced into evidence. Saxon offered to produce the complete loan schedule for the Court's review, but Trustee's counsel indicated that doing so was not necessary. Trustee's counsel cannot now complain about Saxon's failure to attach or produce the entire mortgage loan schedule when Saxon was ready and willing to do so at trial. The fact that the exhibits admitted into evidence at trial do not contain the mortgage loan schedule does not show that the schedule was not attached to those documents at any other point in time, and the fact that Saxon offered to produce it at trial disproves Trustee's counsel's implication that such a loan schedule did not exist. It was not improper for Saxon to refrain from attaching the mortgage loan schedule to its exhibits, and its lack of inclusion is not evidence that the schedule was not attached at any other point during the existence of this loan.

In response to Saxon's assertion that privacy concerns existed which prevented them from introducing the entire mortgage loan schedule, Trustee's counsel visited the SEC website to show the Court the Trust's SEC filings. Trustee's counsel pointed out that what appeared to be a mortgage loan schedule with several categories of information, including addresses, loan numbers, and current payment statuses, had been made a public record on the SEC website. However, Saxon stated that it believed the loan numbers on the website were "dummy loan numbers" and therefore protected borrowers. Neither party presented evidence to prove whether or not the numbers listed on the website were the actual loan numbers for the various borrowers. Whether they are or not, the information on the website included other information which could permit identification of a borrower. The Court notes that the practice of claiming

an exemption to production of documents based on privacy concerns when the documents were publicly filed was previously discouraged in *In re Woodberry*, 383 B.R. 373, 380 (Bankr. D.S.C. 2008)  (stating that creditor's good faith was called into question because creditor pursued a protective order when the document it sought to protect was in fact publicly available and warning that "this tactic should not be repeated").  Nonetheless, even if creditors have engaged in an imprudent practice by arguing that documents should be protected from disclosure because of the sensitive nature of the content when in fact the document has been posted to a public website, such conduct has no bearing on the ultimate issues in this case. Additionally, the mortgage loan schedule is voluminous, and printing hundreds or thousands of pages for the record would have served no purpose, as an electronic image of the schedule was available at trial.  The admission of the redacted mortgage loan schedule, Exhibit G, was proper, and no evidence calling into question the validity or existence of the mortgage loan scheduled was presented.  No issue regarding the reliability of the mortgage loan schedule exists.

    4.  <u>Note is Non-Negotiable</u>

    Trustee's counsel argues that the note is non-negotiable because it has a variable interest rate and therefore does not contain a "sum certain."[15]  Trustee's counsel contends that the former version of the South Carolina Commercial Code prohibited notes with variable interest rates from being negotiable.  Saxon responds that the language of the former Code did not preclude notes with variable rates from being negotiable and argues that the legislature made its intention with respect to this issue clear when it amended the Code to specifically provide that

---

[15] Trustee's counsel also attempted to assert an additional reason that the note is non-negotiable.  At the February 17 hearing, Trustee's counsel submitted an informal memorandum to the Court "from a colleague in Connecticut." This memorandum was not written by counsel for Trustee and is untitled and unsigned.  The memorandum's primary argument is that if a note contains a requirement that a note holder must be notified in the event of a prepayment, it does not meet the definition of a negotiable instrument.  The Court does not find the memorandum submitted by counsel for Trustee to be persuasive and will not consider this argument.

notes with variable interest rates can be negotiated. Saxon additionally argues that the purpose

of the Uniform Commercial Code is to facilitate commercial transactions, not hinder or preclude

them. Both parties acknowledged that, at the time of the hearing, there was no South Carolina

case law on this issue, and Trustee's counsel requested that the Court certify the question

regarding the previous Code section to the South Carolina Supreme Court.

Former S.C. Code § 36-3-104 contained as a requirement for negotiability that the

instrument "contain an unconditional promise or order to pay a sum certain in money."  S.C.

Code Ann. § 36-3-104(1)(b) (prior version; amended 2008).  "Sum certain" was defined in S.C.

Code Ann. § 36-3-106:

> (1) The sum payable is a sum certain even though it is to be paid
>     (a)  with stated interest or by stated installments; or
>     (b)  with stated different rates of interest before and after default or a
>          specified date; or
>     (c)  with a stated discount or addition if paid before or after the date fixed for
>          payment; or
>     (d)  with exchange or less exchange, whether at a fixed rate or at the current
>          rate; or
>     (e)  with costs of collection or an attorney's fee or both upon default.

The Official Comments to Section 36-3-106 stated, "The computation [of interest] must be one

which can be made from the instrument itself without reference to any outside source, and this

section does not make negotiable a note payable with interest 'at the current rate.'"

Current S.C. Code Ann. § 36-3-104(a) provides:

> Except as provided in Subsections (c) and (d), 'negotiable instrument' means an
> unconditional promise or order to pay a fixed amount of money, with or without
> interest or other charges described in the promise or order, if it:
> (1) is payable to bearer or to order at the time it is issued or first comes into
>     possession of a holder;
> (2) is payable on demand or at a definite time; and
> (3) does not state any other undertaking or instruction by the person promising or
>     ordering payment to do any act in addition to the payment of money, but the
>     promise or order may contain (i) an undertaking or power to give, maintain,
>     or protect collateral to secure payment, (ii) an authorization or power to the

> holder to confess judgment or realize on or dispose of collateral, or (iii) a
> waiver of the benefit of any law intended for the advantage or protection of
> an obligor.

Section 36-3-112(b) provides, "Interest may be stated in an instrument as a fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates." The Official Comments provide, "Under Section 3-104(a) the requirement of a 'fixed amount' applies only to principal. . . . If a variable rate of interest is prescribed, the amount of interest is ascertainable by reference to the formula or index described or referred to in the instrument."

Judge Burris, another bankruptcy judge in this District, recently ruled on this very issue in *Kain v. Bank of New York Mellon et al. (In re Kain)*, No. 08-08404-hb, Adv. No. 10-80047-hb, 2012 WL 1098465, at *6 (Bankr. D.S.C. Mar. 30, 2012).[16] The plaintiffs in *Kain* argued that the note at issue was not negotiable because it was an adjustable rate note and therefore was not for a "sum certain". The Court found that the lack of a fixed interest rate was not fatal to a note's negotiability, stating:

> The Official Comment to § 36-3-106 states that the computation of interest "must be one which can be made from the instrument itself without reference to any outside source, and this section does not make negotiable a note payable with interest 'at the current rate.'" S.C. Code Ann. § 36-3-106 official comment no. 1 (2003). However, the language of Former Article 3 contemplated reference to a source outside the four corners of the instrument to determine interest, which did not destroy the negotiability of the document. Section 36-3-118 required that if interest was not specified in the instrument, then "interest means *interest at the judgment rate* at the place of payment from the date of the instrument, or if it is undated from the date of issue." S.C. Code Ann. § 36-3-102(1)(e) (2003). It would be an anomaly for an instrument to be negotiable when the parties must look beyond its four corners to the judgment rate to determine interest when it was not defined therein, but for the instrument to be nonnegotiable if interest—defined in the document—required the parties to look to an easily ascertainable published prime rate.

*Kain*, at *6. The Court also stated that the plaintiffs' argument was inconsistent with the UCC's stated purposes and policies as well as its "objective for commercial uniformity." *Id.*

---

[16] The plaintiffs in Judge Burris's case were also represented by John Cantrell, who represents Trustee in the present case.

In *Carnegie Bank v. Shalleck*, 606 A.2d 389 (N.J. Super. App. Div. 1992), relied on by Saxon, Carnegie Bank sought to foreclose on a mortgage given to secure a variable rate note. The New Jersey court addressed the negotiability of the note, examining the New Jersey statute defining "sum certain", which is identical to the previous version of S.C. Code Ann. § 36-3-106. *Carnegie Bank*, 606 A.2d at 395.  The court noted that states were split on the issue and cited multiple cases on either side of the issue. *Id.* at 395–96. The court pointed out that the National Conference of Commissioners on Uniform State Laws proposed an amendment to the Uniform Commercial Code to allow variable interest rates in negotiable instruments and noted that the amendment was approved and that twenty-one states had amended their statutes for consistency with the change to the Uniform Commercial Code.  *Id.* at 396 and n.1.  The court stated that it believed the amendment was curative and as a curative revision, "no retroactive application [of the new statute] is necessary because the meaning of the original statute has always been the same."  *Id.* at 397 (citing *Kendall v. Snedeker*, 530 A.2d 334 (N.J. Super. App. Div. 1987)). The court went on to find that the previous version of the statute did not preclude instruments with variable rates from being negotiable instruments and stated:

> A contrary interpretation of the Code at the present time would require us both to ignore pertinent language in the Code and to disregard the reality in the commercial marketplace.  The Code directs that its provisions "be liberally construed and applied to promote its underlying purposes and policies," some of which are "to simplify, clarify and modernize the law governing commercial transactions" and "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties."  Variable interest rate mortgage notes have been popular over the last ten years and many commercial lenders have become heavy investors in this State and elsewhere in reliance upon their negotiability.  The use of variable interest rates in mortgage notes is precisely the type of the expanded commercial practice that [the statute] seeks to protect without hurting the borrowers.  This expanded commercial practice has made more people eligible to obtain home mortgages, thereby helping to implement our national public policy of making affordable and decent housing available to more people.  We believe in keeping with the intent and purpose of the Code, we should be flexible in our construction of the Code to meet developing commercial usage.  The fact that a "sum certain" is

nowhere defined in the Code suggests that the drafters anticipated evolving changes in commercial practices. We are persuaded that [the Official Comment] merely represented the prevailing view amongst business people at that time. But in this age of advanced computer technology, the rationale which undergirds [the Comment] no longer prevails. In today's business world, the sum due on variable interest rate notes tied to a fixed index, can literally be ascertained by pressing a few keys on a computer and/or telephone. Consequently, we . . . conclude that the sum certain contemplated by [the statute] means commercial certainty and not mathematical certainty. Commercial certainty exists so long as the sum due can be readily ascertained by reference to some established rules, commercial indices or tables. Such a definition, in our view comports with both the predictability and flexibility contemplated by the Code.

*Id.* at 398. *See also Tanenbaum v. Agri-Capital, Inc.*, 885 F.2d 464, 468 (8th Cir. 1989)

(addressing a note with an interest rate based on "the lesser of (i) 2-1/2 per cent per annum

above the London InterBank Offered Rate (LIBOR) or (ii) the highest rate of interest permitted

under applicable law" and finding, "[G]enerally accepted commercial practices would be

severely and adversely affected should we find that reference to standard published indices

would render an instrument non-negotiable."); *Goss v. Trinity S&L Ass'n*, 813 P.2d 492, 498–99

(Okla. 1991) (considering negotiability of note providing for interest rate tied to the stated rate

of interest as defined by the T-bill index and stating, "While we are cognizant of the language of

the [Official] Comment stating that it must not be necessary to refer to any outside source for

the note to contain a sum certain on its face, we point to the *official language* of the Code which

directs this court to liberally construe the act so as 'to permit the continued expansion of

commercial practices through custom, usage and agreement of the parties. . . .' . . . [F]or this

court to construe the note as anything other than negotiable would in our opinion thwart the

basic mandate laid down by the drafters that the Code remain flexible and responsive to the

business community. . . .Because the business community considers such a note negotiable, it

makes little sense for this court to find otherwise by focusing on a single line in the *unofficial*

text of the Code where its *official* reasoning and purpose would direct us to conclude

46

otherwise."); *Klehm v. Grecian Chalet, Ltd.*, 518 N.E.2d 187, 192 (1987) (finding a note with

an interest rate based on prime rates published in the Wall Street Journal met the requirements

for negotiability and was a negotiable instrument). *But see In re Gas Reclamation, Inc. Secs.*

*Litig.*, 741 F. Supp. 1094, 1103 (S.D.N.Y. 1990) ("Since the calculation of interest due on the

Notes requires reference to the prime rate then being charged by a specified bank, a source

outside the instrument itself, the Notes are not negotiable instruments."); *Centerre Bank of*

*Branson v. Campbell*, 744 S.W.2d 490, 498 (Mo. App. 1998) (citing numerous cases holding

that variable interest rates preclude a note from being negotiable and agreeing with those cases,

finding the note at issue non-negotiable); *Taylor v. Roeder*, 360 S.E.2d 191, 195 (Va. 1987)

("The U.C.C. introduced a degree of clarity into the law of commercial transactions which

permits it to be applied by laymen daily to countless transactions without resort to judicial

interpretation.  The relative predictability of results made possible by that clarity constitutes the

overriding benefit arising from its adoption.  In our view, that factor makes it imperative that

when change is thought desirable, the change should be made by statutory amendment, not

through litigation and judicial interpretation.  Accordingly, we decline the appellee's invitation

to create an exception, by judicial interpretation, in favor of instruments providing for a variable

rate of interest not ascertainable from the instrument itself.").

Saxon cites *Carnegie Bank* for the proposition that curative revisions to a statute obviate the

need for retroactive application of a revised statute.  Saxon argues that the curative exception to

the general rule that statutes should be applied prospectively should be applied here, as the

revision to the South Carolina Code simply clarified the legislature's intention instead of

changing the meaning of the Code.  In South Carolina, statutory enactments are presumptively

prospective, unless there is either a specific provision in the amendment providing otherwise or

47

clear contrary legislative intent.  *South Carolina Dept. of Revenue v. Rosemary Coin Machs., Inc.*, 339 S.C. 25, 28 (2000) (citing *Hyder v. Jones*, 271 S.C. 85 (1978)).  In the case of remedial statutes or statutes that are procedural in nature, however, the application of the statute should be retrospective.  *Id.*

The Court finds that for a number of reasons, the legislature's amendments to South Carolina's Commercial Code were intended to clarify the law rather than modify it, and therefore no retroactive application is necessary.  *See Carnegie Bank*, 606 A.2d at 39 (citing *Kendall v. Snedeker*, 530 A.2d 334 (N.J. Super. App. Div. 1987)) ("Under [the curative] exception, the new statute is intended simply to explain and to clarify the existing law rather than to change the meaning of the original law.  Looked at in that light, no retroactive application is necessary because the meaning of the original statute has always been the same.").  The Court agrees with Judge Burris and those courts in other jurisdictions that have found that the realities of commercial practices and the needs of the business community require that variable rate notes be encompassed in that group of notes the Code defines as negotiable. Variable interest rates are extremely common in recent loan transactions, and finding such notes to be non-negotiable would significantly inhibit many commercial transactions.  The purpose of the Commercial Code is to facilitate rather than frustrate commercial transactions, and the Court's holding is consistent with that crucial purpose.  The fact that Debtor's note contains a variable interest rate does not render the note non-negotiable.

Trustee's counsel's requests that the Court certify this question to the South Carolina Supreme Court.  The job of a federal court in answering questions of state law which have not been addressed by the highest court of the state is to anticipate what that state court would do. *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994) (citing *Doe v. Doe*, 973 F.2d 237, 240 (4th Cir.

1992); *Empire Distrib. of N.C. v. Schieffelin & Co.*, 859 F.2d 1200, 1203 (4th Cir. 1988);

*Wilson v. Ford Motor Co.*, 656 F.2d 960 (4th Cir. 1981)). Federal courts should exercise caution

when considering a request for certification, and should not casually grant such requests. *See*

*Roe*, 28 F.3d at 407 ("Only if the available state law is clearly insufficient should the court

certify the issue to the state court.") (citing *Smith v. FCX, Inc.*, 744 F.2d 1378, 1379 (4th Cir.

1984)); *Coles v. Jenkins*, 24 F. Supp.2d 599, 600 (W.D. Va. 1998) ("Ordinary principles of

judicial economy and efficiency also caution against casually granting motions for certification

of questions to the appropriate state court."); *In re Touch Am. Holdings, Inc.*, 401 B.R. 107, 119

(Bankr. D. Del. 2009) ("Issues of state law should not be routinely certified to state courts

simply because a certification procedure is available.") (citing *Dorman v. Satti*, 862 F.2d 432,

435 (2d Cir. 1988)).  Trustee's counsel requests that the Court certify a question based on an

interpretation of a Code section no longer in effect; thus, the necessity of a ruling from the

South Carolina Supreme court is questionable.  Further, there exists abundant case law from

other jurisdictions and a recent decision from another Judge in this Court on this issue, and the

statutory principles and stated purposes of the Commercial Code are clear. It is unnecessary to

certify this question to the South Carolina Supreme Court, and the Court declines to do so.

    5.  <u>"No Space" Test</u>

    Trustee's counsel argues that the allonges attached to the note are improper because there

was sufficient space for indorsements on the note itself.  Trustee's counsel argues that the "no

space" test requires, if there is space on the note, indorsements must be made in that blank space

on the note.  Trustee's counsel alleges it is not sufficient for the indorsements to be on a

separate sheet of paper in any case, even if the separate sheet containing the indorsements is

stapled to the note, as in this case.

Former S.C. Code § 36-3-202(2), amended to the current version in 2008, states, "An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof."  The Official Comments to that Code section stated:

> Subsection (2) follows decisions holding that a purported indorsement on a mortgage or other separate paper pinned or clipped to an instrument is not sufficient for negotiation.  The indorsement must be on the instrument itself or on a paper intended for the purpose which is so firmly affixed to the instrument as to become an extension or part of it.  Such a paper is called on [sic] allonge.

The final sentence of current S.C. Code § 36-3-204(a), which addresses indorsements and became effective July 1, 2008, states, "For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument."  The Official Comments to section 36-3-204 state, "The last sentence of subsection (a) is based on subsection (2) of former Section 3-202.  An indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement."

Two allonges are attached to Debtor's note.  Both allonges contain Debtor's name, the property address, and the original loan amount, and the first allonge also contains additional information, such as a date, the original lender's name, interest rate, maturity date, and the loan number.  Both allonges are signed at the bottom of the page.  The allonges are stapled to the note and appear after the final page of a prepayment addendum to the note.  Throughout this litigation, Trustee's counsel made much of the fact that more than one set of staple holes appeared on the note.

While the Code requires that an allonge be "affixed" to a note in order for the signature on the allonge to be an indorsement on the note, it is clear from the Official Comments that the "no space" test does not apply in South Carolina.  Further, Trustee's counsel's argument that

50

stapling an allonge to the note is not sufficient to "affix" it to the note is not adopted.   In

*Lamson v. Commercial Credit Corp.*, 531 P.2d 966 (Colo. 1975), the Supreme Court of

Colorado considered whether a special indorsement which was stapled to two checks satisfied

the UCC requirements for an indorsement.   The court stated that the special indorsement was an

allonge and held:

> We agree with the Court of Appeals' statement that a separate paper pinned or
> paper-clipped to an instrument is not sufficient for negotiation.   Section 4-3-
> 202(2), comment 3.   However, we hold, Contra to its decision, that the section
> does permit stapling as an adequate method of firmly affixing the indorsement.
> Stapling is the modern equivalent of gluing or pasting.   Certainly as a physical
> matter it is just as easy to cut by scissors a document pasted or glued to another
> as it is to detach the two by unstapling.   Therefore we hold that under the
> circumstances described, stapling an indorsement to a negotiable instrument is a
> permanent attachment to the checks so that it becomes 'a part thereof.'

*Lamson*, 531 P.2d at 968.   Several other courts have agreed with the decision in *Lamson* and

also held that stapling is sufficient.   *See Adams v. Madison Realty & Dev., Inc.,* 853 F.2d 163,

166 (3rd Cir. 1988) ("We may assume, without actually deciding, that the loose indorsement

sheets accompanying Empire's notes would have been valid allonges had they been stapled or

glued to the notes themselves."); *NAB Asset Venture II v. Lenertz, Inc.*, No. C4-97-2181, 1998

WL 422207, at *2 (Minn. App. 1998) ("We thus hold that the stapling of an allonge to the

instrument is a proper endorsement."); *Southwestern Resolution Corp. v. Watson*, 964 S.W.2d

262, 263–64 (Tex. 1997) (stating that attachment of an allonge by staples has only been

disapproved in cases where an allonge was unnecessary due to room on the instrument for

signatures and holding that an allonge stapled to an instrument is "firmly affixed" to the

instrument).   The stapling of the allonges to the note is sufficient to satisfy section 36-3-204(a)'s

requirement that the allonge be affixed to the note.

51

Trustee's counsel points to the multiple sets of staple holes in the note and allonges as evidence of alteration of the documents.  Trustee's counsel speculates that the allonges were not attached to the note until much later, perhaps right before the litigation.  There is no evidence of this, and Trustee's counsel's accusatory speculation that regarding Saxon altered the note by attaching allonges in anticipation of litigation is without evidentiary support.  Saxon maintained that the allonges were attached at the time they were created, and the Court has no reason to believe otherwise.  Further, the fact that there are more than one set of staple holes in the documents is not evidence of any wrongdoing.  It is reasonable to expect staples to be removed from documents with multiple pages when they are photocopied or electronically imaged, as testimony indicated occurred here. *See Southwestern Resolution Corp. v. Watson*, 964 S.W.2d 262 (Tex. 1997) (finding that the fact that staples had been taken out of the documents for photocopying did not raise any issue regarding whether the documents were firmly affixed and stating that the jury could not infer from the staple holes in the documents that the two documents had not been attached, as that would be "pure conjecture").  The Court carefully inspected the staple holes in the documents, as requested by Trustee's counsel, and surmises nothing other than that staples were affixed and removed for the purpose of making multiple copies or electronic images of the documents.   The "no space" rule does not apply in South Carolina, and the Court finds that the allonges attached to the note were "affixed" to the note as required by the South Carolina Code.  The indorsements on the allonges are proper.

6.  <u>Status of Saxon as a "Holder"</u>

Having determined that the note at issue is a negotiable instrument and that indorsements on allonges affixed to the note are proper, the Court turns to Saxon's status as a holder.  Trustee's counsel argues that under the former version of the South Carolina Commercial Code, which

controls in this case, negotiation is required for transfer of an instrument.  Trustee's counsel

cites *South Carolina Nat'l Bank v. Halter*, 293 S.C. 121 (Ct. App. 1987) for the proposition that

under the former Code, an assignment was not sufficient for a transfer of a legal interest in an

instrument, but that negotiation is required.  Trustee's counsel argues, therefore, that the note in

this case could not be assigned, only negotiated, and that it was not properly negotiated,

resulting in BONYM not having the right to enforce the note and Saxon not having the right to

enforce it on BONYM's behalf.

The first allonge to the original note, bearing the same date as the note, contains an

indorsement from Loanleaders of America, the original lender, to NovaStar Mortgage, Inc.  As

the Court previously discussed, an indorsement on an allonge is valid even if there is sufficient

space for the indorsement on the face of the note, as long as the allonge is affixed to the note.

There has been no evidence that this allonge was not attached to the note and in fact the allonge

was attached to the note at the time of admission of the exhibit at trial; therefore, the

indorsement's location on the first allonge from Loanleaders to Novastar is proper.  Former S.C.

Code § 36-3-202(1) provided that negotiation occurs when an instrument payable to order is

indorsed and delivered to the transferee; S.C. Code § 36-3-202(2) provided that the

"indorsement must be written by or on behalf of the holder."  Here, Loanleaders was clearly a

holder of the note, as it was the original lender, and it signed the allonge.  There was no

evidence that the note was not delivered to Novastar.  In fact, Novastar's later indorsement,

discussed below, is evidence that the note was delivered to and held by Novastar at the relevant

time.  All the requirements for negotiation are met. The indorsement from Loanleaders to

Novastar was proper.

The second indorsement in the chain of title is from NovaStar Mortgage, Inc. to JPMorgan Chase Bank, as Trustee.  This indorsement is on the face of the note, so clearly there is no issue with its placement.   This transfer also meets all the requirements for negotiation, as the indorsement is by a representative from Novastar and there is no evidence that the note was not delivered to US Bank as custodian for JPMorgan Chase.  Trustee's counsel complains that the indorsement is undated, but his complaint is without merit.  *See* former S.C. Code § 36-3-114(1) ("The negotiability of an instrument is not affected by the fact that it is undated, antedated or postdated.").  Trustee's counsel also points out that the indorsement contains a reference to "the Novastar Home Equity Loan Asset-Bank Certificates, Series 2006-1," which is not the Trust involved in this case and which Mr. Goss testified does not actually exist.  The only testimony or other evidence was that this is a scrivener's error on the part of the indorser, and the Court finds that the error is immaterial.  *See* former S.C. Code § 36-3-117 and Official Comment 3; Official Comment to S.C. Code § 36-3-110.  The second indorsement was proper and the note was negotiated from Novastar to JPMorgan Chase.

The final indorsement is on a second allonge attached to the note and is from JPMorgan Chase Bank, N.A. as Trustee for The Novastar Home Equity Loan Asset-Bank Certificates, Series 2006-1 to the Bank of New York Mellon, as Successor Indenture Trustee under NovaStar Mortgage Funding Trust, Series 2006-1, by Saxon Mortgage Services, Inc. as its attorney-in-fact.  Mr. Goss testified at trial that this allonge was created by Natalie Flowers, a former Vice President of Saxon, on BONYM's behalf at some point subsequent to BONYM becoming the trustee.  This allonge is actually unnecessary to the transfer of the note; although Mr. Goss was unsure when exactly it was created, it is clear that at the time of its execution the loans had already been transferred into the Trust and remained there despite a change in trustee.  Trustee's

counsel astutely points out that the indorsement on this allonge also contains a reference to a

non-existent trust instead of a reference to the actual Trust involved here; however, it makes no

difference because the allonge was unnecessary, and the Court will give it no consideration.

Having determined that the note was properly negotiated in all transfers, the Court finds that

BONYM is a holder of the note.  The transfer of the title and duties of trustee for the Trust

occurred pursuant to the Resignation and Assumption Agreement, Exhibit C, on October 1,

2006.  Exhibit C is signed by representatives from both JPMorgan Chase and BONYM[17] and

states:

1. <u>Resignation</u>. Resigning Trustee hereby assigns, transfers, delivers and confirms to Successor Trustee all right, title and interest of Resigning Trustee in and to each of the Agreements and all the rights, powers and trusts of the Resigning Trustee, as trustee or otherwise, under each of the Agreements.
2. <u>Assumption</u>.  Successor Trustee hereby assumes all right, title and interest of Resigning Trustee, as applicable, in and to the trust under each of the Agreements, and all rights, powers and trusts of Resigning Trustee, as trustee or otherwise, under each of the Agreements.

Under this agreement, BONYM became the trustee of the Trust, and the documents in the Trust

are held by US Bank as custodian for the Trust.   Former S.C. Code § 36-1-201(20) defines

"holder" as "a person who is in possession of a document of title or an instrument or a

certificated investment security drawn, issued, or indorsed to him or to his order or to bearer or

in blank."  "Possession" is not defined in the South Carolina Code; however, the District Court

for the District of South Carolina held, after finding that no South Carolina case addressed the

meaning of "possession," that constructive possession is sufficient to satisfy the requirement of

possession in the definition of "holder."  *Midfirst Bank, SSB v. C.W. Haynes & Co., Inc.*, 893 F.

Supp. 1304, 1314 (D.S.C. 1994).  In *Midfirst Bank*, the District Court stated:

---

[17] The agreement is actually signed by a representative of The Bank of New York, as the merger between BONY and BONYM had not yet occurred.

> Although no South Carolina cases interpreting "holder" or "possession" as used
> in this context appear to exist, Mid-First cites authority from other jurisdictions
> in an effort to persuade the court to apply the concept of constructive possession.
> These cases generally hold that constructive possession exists when an
> authorized agent of the owner holds the note on behalf of the owner.  "[T]he
> possession required by the Code to constitute a person a 'holder' may be a
> constructive possession by delivery to one on his behalf.  Thus a person is a
> 'holder' of commercial paper when it is in the physical possession of his agent."
> In order to find constructive delivery, the transferor must deliver the note "with
> the unmistakable intention of transferring title to the instrument."

*Midfirst Bank*, 893 F. Supp. at 1314 (internal citations omitted).

BONYM had constructive possession of Debtor's note through its agent, US Bank, and could obtain the note at any time simply by requesting it from US Bank.  *See Bankers Trust (Delaware) v. 236 Beltway Inv.*, 865 F. Supp. 1186, 1195 (E.D Va. 1994) (finding that after mortgages were pooled and deposited into trust, trustee had constructive possession based on its storage of the documents in a vault at its sister company's office and stating, "The statute sensibly recognizes that a party has constructive possession of a negotiable instrument when it is held by the party's agent, or when the party otherwise can obtain the instrument on demand.") (internal citations omitted).   The instruments were transferred to the Trust with the clear intention to transfer title to the instruments to the Trust, and when BONYM became trustee, it assumed title to the instruments in the Trust. BONYM meets all the requirements of the South Carolina Code and is a holder entitled to enforce the note.

Saxon is the current servicer for BONYM, pursuant to the Servicing Rights Transfer Agreement between Saxon and Novastar, Exhibit E, which transfers to Saxon "full power and authority, acting alone, to do any and all things in connection with the servicing and administration of the Mortgage Loans that [Saxon] may deem necessary or desirable, consistent with the terms of [the Servicing Rights Transfer Agreement] and the Servicing Requirements." Exhibit E, pg. 8–9.   BONYM also executed powers of attorney, Exhibits P and Q, which

provide Saxon with authority to take a wide variety of actions with respect to the instruments in

the Trust.  The mortgages in the Trust were incorporated into Saxon's records when it became

servicer, and Saxon could also obtain Debtor's original note at any time by simply requesting it

from US Bank, which it in fact did for purposes of this trial.[18]  A servicer is a party in interest

and has standing to move for relief from stay and to file proofs of claim on the owner's behalf.

*In re Neals*, 459 B.R. 612, 617 (Bankr. D.S.C. 2011); *In re Woodberry,* 383 B.R. 373, 379

(Bankr. D.S.C. 2008).  BONYM is entitled to enforce the note and Saxon is entitled to do so on

its behalf.  BONYM has standing to file a proof of claim in Debtor's case, and Saxon has

standing to pursue a Motion for Relief from Stay.[19]

## VIII.   Objection to Claim

BONYM has standing to file a proof of claim, and its proof of claim is allowed.  Trustee's

counsel's trial strategy throughout this litigation was to attack Saxon and BONYM rather than

attacking the proof of claim itself.  Trustee's counsel did not raise any arguments about the

underlying claim's validity.  As the Court previously discussed, Trustee's motives and theory in

pursuing this litigation are flawed. Trustee's counsel has made no effort to show that the claim

should be disallowed under 11 U.S.C.§ 506.  Trustee's Claim Objection is overruled and the

claim is allowed as amended.

---

[18] Mr. Goss stated at the February 17 hearing that Saxon had recently implemented a new procedure in which
Saxon would request the custodian file, including the original note and mortgage, for a particular loan once it went
into default.  Thus, while this procedure was not in place during the litigation of this matter, Saxon clearly has the
authority and ability to obtain these documents and take action with respect to them as a servicer acting on
BONYM's behalf.
[19] Because the Court has found that the note was properly negotiated to each party in the chain of title, whether
South Carolina law allows a transfer merely by assignment does not have to be addressed.  Trustee cited *South
Carolina National Bank v. Halter* in support of his argument that negotiation rather than assignment is required.
This argument is not relevant in light of the determination herein.

### IX. Relief from Stay

Saxon seeks relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (2).

Section 362(d), in relevant part, provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization.

### 1. Section 362(d)(1)

Saxon argues that it is entitled to relief from stay under section 362(d)(1) because Debtor has not made a mortgage payment since December 2008 and because it is not adequately protected, as the amount of its claim far exceeds the value of the home. The December 2008 payment actually satisfied the payment due for August 2008; Debtor owes BONYM for all payments beginning September 2008. With respect to the valuation of the home, Exhibit A, admitted without objection, is a Broker's Price Opinion which lists the value of the property at $115,000, $125,000, or $135,000, depending on the timeframe for sale of the property. Exhibit V, admitted over Trustee's counsel's objection, is a payoff statement showing the payoff amount as of December 21, 2011 and shows the amount owed as $264,480.30.

"Cause" is not a term defined in the Bankruptcy Code. *In re Toomer,* No. 10-07273-jw, slip op., at 4 (Bankr. D.S.C. Oct. 5, 2011); *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 489 (Bankr. D.S.C. 2010). As a result, bankruptcy courts have broad discretion in determining whether to grant relief from stay and must make such a determination on a case by case basis. *Toomer,* No. 10-07273-jw, at 4; *Gyro-Trac,* 441 B.R. at 489. In determining whether to grant

relief from stay, the bankruptcy judge should balance any prejudice to the debtor's estate which could potentially occur if the motion is granted against the hardships the movant will experience if the motion is denied. *Gyro-Trac*, 441 B.R. at 489 (quoting *In re Ramkaran*, 315 B.R. 361, 364 (D. Md. 2004)). This Court has found cause in a number of circumstances, including failure to make plan payments,[20] inability to assume a lease,[21] and completion of a foreclosure sale, resulting in mere bare legal title in the debtor.[22] This Court has also found that a debtor's continuous failure to make both pre-petition and post-petition payments to an undersecured creditor constitutes cause. *Toomer*, No. 10-07273-jw, at 4.

Cause clearly exists in this case. Uncontested testimony established that Debtor has not made a mortgage payment in over three years, and BONYM is owed for additional months beyond that time period. The payoff amount on the loan is significantly greater than the value of the property. The Court finds that Saxon has established cause for relief from stay under section 362(d)(1).

2. Section 362(d)(2)

Saxon is also entitled to relief from stay under section 362(d)(2). As noted above, there is no equity in the property, and in fact there is a substantial lack of equity. This is a chapter 7 case, and therefore the property is not necessary for reorganization. Both elements of section 362(d)(2) are satisfied. Saxon is entitled to relief from stay.

---

[20] *In re Watson*, No. 05-08063-dd, slip op., at 3 (Bankr. D.S.C. Feb. 21, 2008).

[21] *In re Dumas*, 392 B.R. 204 (Bankr. D.S.C. 2008) ("A showing of cause is not limited to a lack of adequate protection. In this instance Movant has met its burden of establishing cause for relief from the stay in order to conclude its eviction proceeding. Debtor cannot assume the lease and cannot extend the term. No purpose is served in affording Debtor use of the premises for the remaining two months of the lease term when such use would necessarily be conditioned upon payment of a sum so great that cure would never be undertaken. The ice cream shop closed pre-petition and no effective reorganization of the Debtor's financial affairs could include opening the shop for a period of two months.").

[22] *In re Madison*, 438 B.R. 866 (Bankr. D.S.C. 2010).

## **CONCLUSION**

BONYM has established that it has standing to file a proof of claim.  Because this was the sole issue raised by Trustee in his Objection to Claim, the Objection to Claim is overruled. Saxon is entitled to relief from stay under 11 U.S.C. § 362(d)(1) and (2).  The claim is allowed and Saxon's Motion for Relief from Stay is granted.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**05/09/2012**



David R. Duncan
US Bankruptcy Judge
District of South Carolina

Entered: 05/09/2012